# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **CHIMEZIE AKARA,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **14-40070-TSH** |
| | ) | |
| **KELLY RYAN,** | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OF DECISION AND ORDER
### September 11, 2017

**HILLMAN, D.J.**

### Background

Chimezie Akara ("Petitioner" or "Akara") filed a Petition for a Writ of Habeas Corpus as a person in state custody in accordance with 28 U.S.C. § 2254. Following a jury trial in Massachusetts Superior Court, Akara was convicted on multiple charges, including murder in the first degree on a theory of extreme atrocity or cruelty, three counts of assault with intent to murder, assault with a dangerous weapon, two counts of assault and battery by means of a dangerous weapon, possession of a firearm without a license, and possession of ammunition without a firearm identification card. Akara was sentenced to life without parole and consecutive sentences aggregating between 66 and 80 years. The conviction was affirmed by the Massachusetts Supreme Judicial Court ("SJC") on May 21, 2013. Akara now seeks habeas relief on the following grounds:

> **Ground One:** Petitioner's conviction on a joint venture theory was not supported by sufficient evidence and therefore violated Petitioner's constitutional right to due process;

**Ground Two:** Denial of severance motions in the circumstances of this case violated the Petitioner's due process rights; and

**Ground Three:** The closing arguments of the prosecutor and of co-defendant's counsel were improper and violated the Petitioner's due process rights.

Akara has exhausted state-court remedies with respect to all of the grounds for relief asserted in his Petition. For the reasons outlined below, his Petition is ***denied***.

### Facts

The Court lists the facts relevant to the petition as the SJC found them, "fleshed out by other facts contained in the record and consistent with the state court's findings." *McCambridge v. Hill*, 303 F.3d 24, 26 (1st Cir. 2002).

On February 5, 2003, the Petitioner and co-defendant in the proceedings below, Andre Green ("Green"), along with two other individuals, Sean Brown ("Brown") and Burrell Ramsey-White ("Ramsey-White"), spent time at the home of another individual, Kalif Christopher ("Christopher"). Sometime between 7:40 PM and 7:50 PM on February 5, 2003, the four men boarded Orange Line train car 1205 at the Forest Hills MBTA station. They stood in two groups, with Green and Akara standing near the rearmost door on the platform side of the car and Brown and Ramsey-White standing together across the aisle. Akara was the only one of the four men wearing a baseball cap. Philip Gadsden ("Gadsden") boarded the same train car and sat near the rear door, near where Akara and Green were standing.

As the train left the Ruggles station a few stops later, a passenger heard a "very loud, tense verbal exchange" between the men standing, Akara and Green, and the man sitting, Gadsden. At that time, Gadsden saw that one of the standing men was holding a gun at his side. Both Akara and Green were looking in Gadsden's direction, and another passenger saw one of the men raise his arm and point it in Gadsden's direction. The passenger's view was blocked, and

he could not see what the man pointing held in his hand. Both Green and Akara were wearing hooded sweatshirts, and the one pointing was wearing a baseball cap.

Gadsden got up from his seat and started moving to the front of train, waving his arms and yelling, "there's a gun on the train" and "they have a gun," while pointing to Akara and Green. He told passengers to get down, to "stay back," to "move to the other side," and to "get off the train." As the doors opened at the Massachusetts Avenue MBTA station, passengers began running from the train car. Akara and Green also got off the train.

Multiple passengers, either on the train or on the platform, heard pops or gunshots coming from the rear of train car 1205. One passenger, in a car behind car 1205, heard several loud bangs coming from the front of the train followed by shouts and screams from the same direction. About ten seconds later, he saw a "pack" of four or five individuals running furiously away from the direction of the commotion. The passenger heard the men laughing or chuckling in a congratulatory manner. Another passenger also saw a group of four young males running toward the station exit. He observed the tallest member of the group (Akara) holding his waist as if gripping something near his belt. A security camera on a nearby parking garage captured images of four men running from the station and through a parking lot.

Two shell casings were found on the platform. One bullet ricocheted off the outside of car 1205 and pierced a guitar case carried by a music student, who was running from the train with the guitar case over his right shoulder.

The second bullet is the subject of this petition. A passenger heard a scream, turned, and saw a woman, Hawa Barry, bleeding profusely from the left side of her abdomen. Barry, a recent immigrant to the United States and unable to understand English, was thirty-six weeks pregnant at the time. She did not understand Gadsden's warnings and was shot through the stomach as she

attempted to exit the train. She was rushed to the hospital; her son was born alive, but later died from serious internal injuries caused by the bullet. Barry survived after emergency surgery.

Akara and Green returned to the latter's apartment in the South End section of Boston. There, Akara showed Green's cousin a nine-millimeter Desert Eagle semiautomatic handgun, the same type of gun used in the shooting and a type rare in Boston at the time. Another of Green's cousins had seen Akara with same weapon a few weeks earlier. Akara explained that he and Green "had beef on the train."

The defendants left the apartment for approximately thirty minutes. When they returned, Akara was no longer wearing the jacket and hat he had been wearing on the train. Green was still wearing a black hooded sweatshirt with a distinctive pointed hood. He was not seen wearing that sweatshirt after the night of the shooting. One of Green's brothers informed them that a pregnant woman had been shot on the subway. Akara responded, "Oh shit," and Green responded, "Damn it."

Akara left and returned to Christopher's house. Green also left, going to the apartment of his girlfriend, Sheena Sanford, where he spent the night. Later that night and into the early morning hours, Akara and Green spoke with each other by telephone four times. On one occasion when Akara called, Sanford answered, and Akara asked her, "Did I get away with it?" According to Christopher, who overheard Akara speaking on the telephone, Akara sounded like he was "giving orders," saying something to the effect that the person on the telephone should "bring it back" or "bring it here," and calling the individual "stupid." After one call to Green, Akara told Christopher "things [were] getting hot."

In the ensuing days, Akara and Green both spoke to two of Green's relatives about the shooting. Akara called Green's brother six times to ask him if he had heard anything and to warn

him, "Don't say anything. Don't snitch." Akara similarly instructed Green's cousin not to tell the police anything, not to "snitch," and mentioned his concern that there might be gunpowder on his gloves. Green also told his cousin not to talk to the police.

Police officers recovered videotape surveillance images that placed Akara, Green, Brown, and Ramsey-White inside the Forest Hills subway station at approximately 7:30 P.M. Based on the videotape surveillance images, officers went to Akara's home on February 9, 2003, to talk to him about his involvement in the shooting. Akara denied being at the Forest Hills or Massachusetts Avenue subway stations that evening, or being on an Orange Line train, denied wearing a baseball cap with the interlocking letters "TC," and denied knowing Green, Brown, and Ramsey-White. The next day, Green was interviewed at police headquarters. Green similarly denied being at those locations on February 5, and denied wearing a black hooded sweatshirt.

## Procedural History

After a jury trial, Akara was convicted on March 26, 2007 on multiple charges, including murder in the first degree on a theory of extreme atrocity or cruelty, and was sentenced to life without parole and consecutive sentences aggregating between 66 and 80 years.

A motion for new trial prior to the direct appeal was filed on April 16, 2010 in light of a witness, Julian Green, recanting his testimony given in the Superior Court trial. That motion was denied on November 17, 2010. *Commonwealth v. Akara*, 27 Mass. L. Rep. 514 (Suffolk Sup. Ct. 2010).

Akara filed a direct appeal to the Supreme Judicial Court, contesting his conviction on multiple grounds: (1) the theory of joint venture should not have been submitted to the jury; (2) the defendants' multiple motions for severance should have been granted; (3) the jury instructions omitted the requirement that the jury find a joint venture existed; (4) the co-

defendant's and prosecutor's closing arguments violated the right to a fair trial; (5) the jury instruction on punishment removed the co-defendant's family bias from the jury's considerations; (6) the jury instruction on the theory of extreme atrocity and cruelty improperly broadened the scope of liability by deviating from the model jury instructions; and (7) evidence of gang membership and affiliation was improperly admitted. The SJC denied Akara's appeal on all grounds. A petition for rehearing was filed on June 3, 2013 on the issue of the SJC's use of an insupportable inference to sustain the convictions. That petition was denied on July 2, 2013, though the SJC issued a modified opinion to amend factual errors.

Akara did not file for a writ of certiorari, and this petition for habeas corpus was timely filed on May 20, 2014.

## DISCUSSION

Akara's petition for a writ of habeas corpus is governed by the standards set out in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. AEDPA provides that federal courts may only grant habeas relief if the state court adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"Clearly established federal law" under § 2254(d)(1) refers to the "governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision" and must be "holdings, as opposed to dicta." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172 (2003). A state court decision is "contrary to" existing Supreme Court

precedent if it "'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from our precedent.'" *Dagley v. Russo*, 540 F.3d 8, 16 (1st Cir. 2008) (quoting *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362 (2002)).

State court adjudications are "unreasonable applications" if they "identif[y] the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably appl[y] that principle to the facts of the prisoner's case." *Hensley v. Roden*, 755 F.3d 724, 731 (1st Cir. 2014). State court applications of federal law must be more than "incorrect or erroneous" to afford habeas relief: they must be "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2535 (2003). The petitioner must demonstrate that the "state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103, 131 S.Ct. 770, 786-787 (2011).

When determining whether the state court's decision was "based on an unreasonable determination of the facts," reviewing courts "may not characterize … state-court factual determinations as unreasonable 'merely because [they] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. ___, ___, 135 S.Ct. 2269, 2277 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841 (2010)). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary" and decisions based on factual determinations "will not be overturned … unless objectively unreasonable." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041 (2003); 28 U.S.C. § 2254(e)(1). Review under 2254(d)(2) is "limited to the record that was

before the state court." *Garuti v. Roden*, 733 F.3d 18, 23 (1st Cir. 2013) (quoting *Brown v. O'Brien*, 666 F.3d 818, 822 n.3 (1st Cir. 2012).

<u>*Ground One: Petitioner's Sufficiency of Evidence Claim Relating to Theory of Joint Venture*</u>

Akara contends that the evidence on the record was constitutionally insufficient to convict him under the "joint venture" theory. Both Green and Akara argued to the SJC that the "verdict should be vacated because the evidence was insufficient to support both of the alternative theories of joint venture." *Commonwealth v. Akara*, 465 Mass. 245, 253, 988 N.E.2d 430, 438 (2013). The SJC affirmed the verdict, determining that the jury could have found the evidence supported each alternative theory of guilt. *Id.* at 256. Akara now contends that this decision was both an unreasonable application of clearly established federal law as determined by the Supreme Court, and was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Both parties agree that sufficiency of evidence claims are governed by the Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). *Jackson* states that the constitutional right to due process guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Id.* at 316, 99 S.Ct. 2781. The relevant test is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *O'Laughlin v. O'Brien*, 568 F.3d 287, 299 (1st Cir. 2009) (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781) (emphasis in original). In evaluating the evidence, the reviewing court must exercise "some degree of intellectual rigor," and not credit "evidentiary interpretations and illations that are unreasonable, insupportable, or

overly speculative." *Leftwich v. Maloney*, 532 F.3d 20, 23 (1st Cir. 2008) (quoting *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995)). For a federal court reviewing a habeas petitioner's sufficiency of evidence claim, the question is whether the state court's determination was an "unreasonable application" of the *Jackson* standard. *See Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir. 2001) ("The habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted.").

This Court must also ask whether the state court determination is entitled to AEDPA deference at all before examining the Petitioner's sufficiency of evidence claim under § 2254(d). In addressing Petitioner's sufficiency of evidence claim, the SJC did not explicitly apply *Jackson*, but instead used a standard derived from Massachusetts state law and precedent.[1] *Akara*, 465 Mass. at 253, 988 N.E.2d at 438. The SJC relied on a series of Massachusetts cases stemming from *Commonwealth v. Latimore*, 378 Mass. 671, 393 N.E.2d 370 (1979). The First Circuit has held that where a state court decision is framed in terms of state law, the adjudication may receive § 2254(d)(1) deference "so long as the state standard is at least as protective of the defendant's rights as its federal counterpart." *Leftwich*, 532 F.3d at 23–24; *See also Linton v. Saba*, 812 F.3d 112, 124 (1st Cir. 2016) ("That the SJC applied *Latimore* rather than *Jackson* does not diminish its claim to deference under AEDPA…."). In *Latimore*, the SJC expressly adopted the federal constitutional standard for sufficiency of evidence challenges as set out in *Jackson*. *Commonwealth v. Latimore*, 378 Mass. 671, 677–78, 393 N.E.2d 370 (citing *Jackson*,

---

[1]Specifically, the SJC applied the following standard: "we ask whether, viewing the evidence in the light most favorable to the Commonwealth, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Akara*, 465 Mass. at 253, 988 N.E.2d at 438 (quoting *Commonwealth v. Perez*, 460 Mass. 683, 702, 954 N.E.2d 1 (2011) (emphasis in original).

443 U.S. 307, 99 S.Ct. 2781). Therefore, the SJC's decision on Akara's sufficiency of evidence claim is entitled to deference under 28 U.S.C. 2254(d)(1).

The SJC acknowledged that this case was an "unusual circumstance[]" and found that for each of the prosecution's alternative theories to support a valid jury verdict, each must "support[] the conclusion that each defendant, although not the shooter, participated in and shared the requisite intent to commit the crime." *Akara*, 465 Mass. at 254. Akara argues that the evidence on the record was insufficient to support the theory that Green was the shooter and Akara a joint venturer in that shooting. Based on the record, the affirmance of Akara's convictions was not an unreasonable application of the *Jackson* standard. The SJC applied the proper constitutional standard through *Latimore*.

The jury returned a general verdict in this case. As the Supreme Court has held, when a jury is provided multiple theories and that jury returns general verdict, the conviction is "valid so long as it was legally supportable on one of the submitted grounds…." *Griffin v. United States*, 502 U.S. 46, 49, 112 S.Ct. 466, 469 (1991). "On federal habeas review of a state-court conviction that potentially rests on dual theories of guilt, the writ will not issue as long as one of the two theories is adequately supported." *Leftwich*, 532 F.3d at 24; *See also United States v. Moran*, 393 F.3d 1, 14-15 (1st Cir. 2004); *Francois v. United States*, 2016 WL 4079494 at *3 (D. R.I. July 29, 2016). Although Massachusetts law rejects the guiding principle from *Griffin*, *see Commonwealth v. Plunkett*, 422 Mass. 634, 664 N.E.2d 833 (1996), "[u]nder *Jackson* … the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655, 132 S.Ct. 2060, 2064 (2012).

Akara concedes that "[n]o one disputed that there was sufficient evidence for a jury to conclude that the petitioner was the shooter or that Green was the shooter." Pet. Memo at 7.

Effectively, Akara admits the evidence was sufficient to convict him under the principal theory of liability. As the facts sufficiently support that theory, the conviction is valid and Akara's conviction meets the standard set by *Jackson*.

Even if that were not the case, there was sufficient evidence on the record to support Akara's conviction under the joint venturer theory. The SJC, when considering this argument, constructed the facts relating to joint venture as follows:

> There was also evidence providing a sufficient basis for an alternative finding: that it was Green who had fired the shots intended to hit Gadsden, and that Akara shared his intent and knowingly participated in the shooting. There was evidence that Green and Akara had a tense exchange with Gadsden on the train. The jury reasonably could have inferred that Akara had passed the gun to Green at some point before the shooting, and that Green clutched the gun in his pocket until the two left the train and Green fired at Gadsden. The jury could have credited Barry's testimony that, as Green "was coming out of the train, I saw his hand taking something and shooting me." On this version of events, the jury reasonably could have determined that Akara provided assistance to Green by handing him the gun that had been in Akara's possession; that Akara stood by Green as he fired the weapon at Gadsden; and that Akara and Green fled the scene and continued to work together after the shooting in order to ensure that they would not be apprehended by the police.

*Akara*, 465 Mass at 255-256, 988 N.E.2d at 440. Akara contests this recitation of the facts in his memorandum, but after reviewing the record and drawing all reasonable inferences in the prosecution's favor, this Court finds the evidence permitted a rational jury to find Akara a joint venturer in the murder of Hawa Barry's child. As Akara notes, there was enough testimony for a jury to identify either Green or Akara as the shooter. Both Green and Akara were involved in the "tense" exchange with Gadsden, and multiple witnesses testified that Gadsden yelled "*they have a gun*" on the train car. The jury also heard evidence that Akara possessed the Desert Eagle prior to the February 5, 2003 shootings. Witness Julian Green testified that just a few weeks earlier, Akara had shown him the same type of weapon. Given that the evidence supports either proposition – that Akara fired the gun, or Green did – it is not unreasonable for a jury to infer

that, if they believed Green to be the shooter, Akara handed the gun to him some point before the incident occurred.

There was also ample evidence that both Akara and Green worked together after the shootings to avoid punishment. They ran from the scene of the shooting together, laughing as they went. Both disposed of their clothes shortly after the incident. Akara and Green spoke to each other four times in the early morning hours just after the shooting, inferably in an attempt to form a plan to disconnect themselves from the incident. Both Akara and Green told members of Green's family not to "snitch" and not to talk to the police. Given these facts, there was sufficient evidence in the record from which a jury could find Akara guilty of these charges under the joint venture theory. The conviction is therefore valid under the standards set by *Jackson* and *Latimore*.

Akara also contends that the factual scenario expressed by the SJC was "based on an unreasonable determination of the facts in light of the evidence presented" in violation of § 2254(d)(2). That claim is similarly without merit. Contrary to the argument presented in the Petitioner's memorandum in support of his petition, the SJC did not "completely distort" the evidence: as noted above, there was sufficient evidence on the record from which a jury could have found (1) that the Petitioner possessed the weapon used in the shooting prior to February 5, 2003 and (2) Andre Green fired the weapon in that incident. Akara and Green fled together and made efforts to ensure they were not apprehended. This interpretation of the evidence is not "objectively unreasonable" and the Petitioner has not rebutted those factual findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Petitioner therefore is not entitled to habeas relief under 2254(d)(2) on his sufficiency of the evidence claim.

<u>*Ground Two: Petitioner's Severance Claim*</u>

Akara asserts the trial court erred by failing to sever his trial from his co-defendant Green's, arguing that their defenses were mutually antagonistic and irreconcilable. Both Akara and Green repeatedly moved for severance throughout the trial, but all of their motions were denied.

The SJC's opinion relied primarily on Massachusetts law in concluding that the failure to sever the trials was not prejudicial. When multiple individuals are charged with criminal conduct arising from the same event, it is presumed they will be tried together. Mass. R. Crim. P. 9(b). State law allows for severance if the "prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Commonwealth v. Vasquez*, 462 Mass. 827, 836, 971 N.E.2d 783, 792-793 (2012) (quoting *Commonwealth v. Moran*, 387 Mass. 644,658, 722 N.E.2d 399 (1982)). Severance is only required if the defenses are "mutually antagonistic and irreconcilable," meaning that the "sole defense of each was the guilt of the other" or "acceptance of one party's defense will preclude the acquittal of the other." *Id.* at 837, 971 N.E.2d at 793 (citing *Moran*, 387 Mass. at 655, 442 N.E.2d at 406); *see United States v. Paradis*, 802 F.2d 553, 561 (1st Cir. 1986) ("To obtain severance on the grounds of conflicting defenses, a defendant has to demonstrate that the defenses are so irreconcilable as to involve fundamental disagreement over core and basic facts."). Even when defenses are irreconcilable, however, severance is not always required if "there is no compelling prejudice" and "the jury were warranted in finding [the defendant] guilty . . . on the basis of . . . eyewitness testimony [and other evidence]." *Commonwealth v. Siny Van Tran*, 460 Mass. 535, 543, 953 N.E.2d 139, 150 (2011) (quoting *Commonwealth v. Stewart*, 450 Mass. 25, 31, 875 N.E.2d 846, 853-854 (2007)).

Massachusetts state law regarding severance "generally tracks" the applicable federal law. *Moran*, 387 Mass. at 655, 442 N.E.2d at 406. There is a preference in federal law to try defendants indicted for the same criminal activity together. Fed. R. Crim. P. 8(b); *Zafiro v. United States*, 506 U.S. 534, 537, 113 S. Ct. 933, 937 (1993). Severance may be required under federal law, like Massachusetts law, when joint trials will prejudice a defendant, often because of mutually antagonistic defenses between co-defendants. Fed. R. Crim. P. 14(a); *Zafiro*, 506 U.S. at 538, 113 S. Ct. 933. "Mutually antagonistic defenses are not prejudicial per se," and severance should only be granted if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 538-39, 113 S. Ct. 933. "'Garden variety' prejudice, which always exists when more than one defendant or offense are tried together, does not warrant a new trial." *United States v. Tejeda*, 481 F.3d 44, 55 (1st Cir. 2007). The First Circuit has also held, though outside the habeas context, that the "trial judge has considerable latitude in deciding severance questions." *United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993) (internal quotations omitted); *see also Moran*, 387 Mass. at 407, 442 N.E.2d at 658 ("In this Commonwealth, severance is usually a matter within the sound discretion of the trial judge.").

Both parties present *Zafiro* as the applicable "clearly established federal law" to evaluate Petitioner's severance claim. Another Massachusetts District Court recently noted the First Circuit has not yet ruled on whether *Zafiro* is "clearly established federal law" that is binding on the states. *Hernandez v. Massachusetts*, 2017 U.S. Dist. LEXIS 7577 at *14 (D. Mass. Jan. 19, 2017); *See Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir. 2010) (holding *Zafiro* "does not establish a constitutional standard binding on the states requiring severance in cases where defendants present mutually antagonistic defenses"). However, I find, as the court in *Hernandez*

found, that it is unnecessary to decide the issue because "the SJC here adhered to state law that is substantially similar to *Zafiro*."[2] *Hernandez*, LEXIS 7577 at *14.

While the Court is cognizant of the "potential clash of interests" between Green's defense and the Petitioner's, particularly considering the former chose to testify while the latter did not, the SJC's affirming the denial of severance was not an unreasonable application of *Zafiro*. The SJC held that, even assuming Akara's and Green's defenses were irreconcilable, there was "considerable independent evidence of the guilt of each defendant" from which a jury could reasonably conclude both defendants were guilty without relying on inculpatory evidence from Green. *Akara*, 465 Mass. at 257-258, 988 N.E.2d at 441-442; *see United States v. Palow*, 777 F.2d 52, 55 (1st Cir. 1985) (severance not warranted in part because, even if co-defendants were unable to testify because trials were severed, sufficient independent evidence linked defendant to the crime); *Siny Van Tran*, 460 Mass. at 543, 953 N.E.2d at 150 (severance not required when other evidence is strong enough that jury was warranted in finding guilty verdict).

The SJC correctly assessed the evidence on the record. The jury heard ample testimony from a number of witnesses establishing that either Green or Akara was the shooter on that Orange Line train. The two boarded the train together, were present at the scene of the incident, and there was abundant evidence (which, again, the Petitioner concedes) that one of them fired the gun. Akara and Green fled the scene together, and additional witnesses demonstrated that the two attempted to disconnect themselves from the crime, either by discarding incriminating physical evidence or directly instructing others not to speak to the police. Other witness testimony connected the Petitioner to the gun used in the shooting. Even if the jury either entirely

---

[2] Indeed, the SJC's opinion cited to *Zafiro* directly when addressing the severance issue. *Akara*, 465 Mass. at 257, 988 N.E.2d at 441.

credited or entirely discredited the testimony of Andre Green, there was more than enough evidence on the record from which a jury could determine both defendants were guilty of the charged crimes. It cannot be said the prejudice to the Petitioner "prevent[ed] the jury from making a reliable judgment about guilt or innocence," and therefore SJC's affirmance of the decision not to sever the trials was not an unreasonable application of either *Zafiro* or comparable state law. *Zafiro*, 506 U.S. at 539, 113 S.Ct. at 938.

Nor can the SJC's affirmance be characterized as being "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). As noted above, the Court must presume the state court's findings are sound unless Akara "rebuts the presumption of correctness by clear and convincing evidence." *Miller-El*, 545 U.S. at 240, 123 S.Ct. 1029 (internal quotations omitted); 28 U.S.C. § 2254(e)(1). Nothing in the record leads this Court to the belief that the state court's findings were false, and the Petitioner has not presented this court with evidence that clearly and convincingly rebuts those findings.

### *Ground Three: Petitioner's Claims Regarding Improper Closing Arguments*

Finally, the Petitioner contends that the closing arguments from both the prosecutor and his co-defendant's counsel were improper and violated his due process rights. Petitioner argues the SJC again misapplied clearly established federal law such that he is entitled to habeas relief.

Both parties agree that, for claims regarding improper remarks during closing arguments, the established law states the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)). In making that determination, courts will "examine (1) whether the prosecutor's conduct was isolated and/or deliberate; (2)

whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case." *Olszewski v. Spencer*, 466 F.3d 47, 59 (1st Cir. 2006) (quoting *United States v. Lowe*, 145 F.3d 45, 50 (1st Cir. 1998)). On habeas review, the First Circuit employs the *Darden* standard when assessing the potential prejudicial effect of improper closing arguments.[3] *See Kirwan v. Spencer*, 631 F.3d 582 (1st Cir. 2011) ("There is no precise federal standard governing due process claims based on a prosecutor's remarks….*Darden* and *Donnelly*, however, provide the relevant Supreme Court law") (quoting *Dagley*, 540 F.3d at 15 n.3). The Supreme Court has also noted that the *Darden* standard is a "very general one" that affords courts "more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37, 48, 132 S. Ct. 2148, 2155 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 2155 (2004)).

　　As with Akara's sufficiency claim, the question again is whether the state court determination is entitled to deference, as the SJC did not explicitly apply the *Darden* or *Donnelly* standards. It instead applied a standard derived from and developed in *Commonwealth v. Kelly*, 417 Mass. 266 (1994). The SJC cited to various decisions in the *Kelly* line of cases while analyzing the improper comments made by the prosecution and the co-defendant's counsel.[4]

---

[3] While the First Circuit uses a four factor test to determine whether an improper closing was prejudicial to a defendant, in the context of habeas review this test is not "clearly established federal law" and is therefore inapplicable. *See Parker*, 567 U.S. at 48, 132 S. Ct. 2148 (holding Sixth Circuit erred by granting habeas review based on application of their own precedents rather than the Supreme Court's in assessing harm from improper closing).

[4] Although the SJC did not specifically elucidate the standard applied, their opinion cites *Commonwealth v. Beaudry*, 445 Mass. 577, 839 N.E.2d 298 (2005), which explicitly quotes the relevant standard from *Kelly*. The SJC's opinion cites the *Beaudry* decision while evaluating the prosecutor's closing, and explores the factors of the *Kelly* standard when evaluating the co-defendant's closing.

*Akara*, 465 Mass. at 262-265, 988 N.E.2d at 444-447. The *Kelly* standard "includes all of the factors explicitly considered by the Court in *Donnelly* and *Darden*, or close variants thereof." *Dagley*, 540 F.3d at 15 n.3. Accordingly, because the state law standard applied is "at least as protective of the defendant's rights as its federal counterpart," the SJC's decision is entitled to deference under § 2254(d). *Leftwich*, 532 F.3d at 23.

### *(1) Prosecutor's Argument*

Akara argues the SJC erred in evaluating the prejudicial effect of the prosecutor's closing argument regarding joint venture. The prosecutor implied that the jury could find a joint venture between Green and Akara because the "Boston Police, the District Attorney's Office, and the Suffolk County Grand Jury had heard sufficient evidence to charge not one, but two people." Although this comment improperly suggested the police believed both Akara and Green were involved in the shooting because both were indicted, the Court agrees with the SJC that it was not sufficiently prejudicial to deny Akara his due process rights.

An indictment cannot be used as evidence of guilt. *Bell v. Wolfish*, 441 U.S. 520, 533, 99 S.Ct. 1861, 1870 (1979). However, the trial judge provided proper instruction on that very point in his final charge to the jury:

> I told you at the outset of the trial, that the fact … defendants are seated in front of you and accused of allegedly committing crimes against the Commonwealth of Massachusetts is not evidence of his or her guilt and it should not be taken as raising any inference of prejudice against him or them …. The fact that somebody is indicted of a crime is not evidence that they committed a crime and should not be considered for that purpose.

Trial Tr. Vol. 28, pp. 71-72, March 13, 2007. The improper conduct was relevant to the critical issue of joint venture, a highly contested issue throughout the trial and in this Petition. *Akara*, 465 Mass. at 262, 988 N.E.2d at 444-445. Though there may have been the possibility of

prejudice from the prosecutor's comments, this was a single improper comment over the course of an extended trial. *See United States v. Capone*, 683 F.2d 582, 586 (1ˢᵗ Cir. 1982) (improper appeal to passion in closing argument not prejudicial because it was not deliberate, was isolated, and was accompanied by curative instructions); *Duckett v. Godinez*, 67 F.3d 734, 743 (9ᵗʰ Cir. 1995) ("isolated incident" of prosecutor's improper comment during lengthy trial did not justify habeas relief when coupled with curative jury instructions). The trial judge's jury instructions alleviate the concerns of prejudice. Although there was no curative instruction made contemporaneously with the prosecutor's comment, the jury instruction came just hours after the prosecutor's closing argument. Moreover, the jury was instructed that the closing arguments are not evidence. Trial Tr. Vol. 28, p. 44, March 13, 2007. As "jurors are normally presumed to follow the trial court's instructions," the judge's instruction sufficiently rectified the prosecutor's comment, and the comment thus could not have affected the jury's deliberations. *United States v. Sampson*, 486 F.3d 13, 39 (1ˢᵗ Cir. 2007).

Akara also argues that this comment by the prosecutor was more pernicious than simply suggesting his guilt through the indictment. He claims that the prosecutor "went much farther than that by stating that [the prosecutor's] office … and the Boston police … also concluded that two people were involved." Pet. Memo at 13. Although the Petitioner gestures toward the idea that this comment is a misstatement of evidence, he cites nothing in support of that contention. Moreover, plainly read, the prosecutor's comment suggests only that there was sufficient evidence to indict both Green and Akara; while the indictment clearly cannot be considered as evidence of guilt, as both men stood on trial together, this fact was no mystery to the jury. The jury was properly instructed that indictments are not indicative of guilt, and that closing arguments are not evidence. Trial Tr. Vol. 28, pp. 44, 71-72, March 13, 2007. The SJC therefore

did not unreasonably apply the state law equivalent of the *Darden* standard, and Akara's claim

for relief is denied on this argument.

### (2) Co-Defendant's Closing Argument

Akara further argues that multiple comments during his co-defendant's closing statement

were also improper and violated his due process rights. The SJC's opinion categorized Akara's

claims against Green's counsel into three general categories: whether counsel (1) implicitly

commented on Akara's decision not to testify; (2) improperly vouched for the testimony of

Green and his family, thereby injecting his personal credibility and opinions into the case; and

(3) inflamed the jury's passions against Akara by urging them to focus on autopsy photos of the

victim. Akara contends that the SJC unreasonably applied the standard from *Darden* in

considering these arguments.[5]

### (i) Co-Defendant's Comments on Petitioner's Failure to Testify

Petitioner argues that Green's counsel's comment during his closing that his client had

the "courage" to testify was an impermissible indirect comment on Akara's failure to testify. It is

a violation of the Fifth Amendment for a prosecutor to "comment – either directly or indirectly –

upon the defendant's failure to testify in his or her own defense." *United States v. Bey*, 188 F.3d

1, 8 (1st Cir. 1991). The First Circuit asks when determining if such a comment was improper

"whether the language used was manifestly intended or was of such character that the jury would

naturally and necessarily take it to be a comment on the failure of the accused to testify." *Oses v.*

*Massachusetts*, 775 F. Supp 443, 464 (D. Mass. 1991) (quoting *Ferreira v. Fair*, 732 F.2d 245,

---

[5]It is noteworthy, in considering Akara's contentions regarding co-defendant's counsel, that "improper statements by counsel for a codefendant may result in prejudice to a defendant, [but] they are less likely to do so than improper arguments by a prosecutor." *Akara*, 465 Mass. at 263, 988 N.E.2d at 445 (citing *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629 (1935); *see also Young*, 470 U.S. at 7-10, 105 S. Ct. 1038.

249 (1st Cir. 1984)). A court must view those comments in context, as when particular comments "are susceptible to two plausible meanings, one of which is unexceptionable and one of which is forbidden, context frequently determines meaning." *United States v. Taylor*, 54 F.3d 967, 979 (1st Cir. 1995); *See also United States v. Lilly*, 983 F.2d 300, 307 (1st Cir. 1992). Within that context, a court "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 647, 94 S.Ct. 1868.

The SJC found the comment proper because no "direct reference" was made to Akara's decision not to testify. Akara properly urges us toward the context to evaluate his co-defendant's comments,[6] but even when viewed within the structure of the closing argument, it is not clear these statements highlighted the Petitioner's decision not to testify. This Courts agree with the SJC that Green's counsel was "emphasiz[ing] that his client faced cross-examination from two motivated adversaries, the prosecutor and counsel for Akara." *Akara*, 465 Mass. at 264, 988 N.E.2d at 446. Moreover, the trial judge properly instructed the jury both that closing arguments are not evidence, and that the jury should draw no inferences from the fact that the Petitioner did

---

[6] The relevant context, as purported by the Petitioner in his Memorandum:

Andre Green [is] fighting a war on two fronts, the Commonwealth v. Andre Green and Chimezie Akara versus Andre Green. Andre Green [had] the courage, the courage to get up from that seat, and walk to that seat and to subject himself to a blistering cross examination by Mr. Akara's attorney. Two and one half days he sat on that stand longer than any other witness combined with other witnesses as far as total time of testimony is concerned. He admitted to you that he lied, but he also told you that he told the truth. And the outline [of] what he told the police in the second half of February 10th, [is] very, very similar to the story that he told you on the stand. Chimezie Akara shot the gun. Chimezie Akara was staring this person down. Chimezie Akara, Chimezie Akara, Chimezie Akara.

Trial Tr.., Vol. 27, pp. 95-96, March 12, 2007.

not testify. Trial Tr. Vol. 28, pp. 44, 63, 64-66, March 13, 2007; *see Oses*, 775 F. Supp. at 464

(finding that "standing alone," prejudicial effect of comment by judge regarding defendant's

failure to testify would be mitigated by jury instructions). The potentially improper comment

therefore did not "so infect the trial with unfairness," and Akara's argument therefore fails to

justify habeas relief.

*(ii) Co-Defendant's Counsel Vouching for Green and Green's Family's Testimony*

Petitioner next contends that the statements by co-defendant during closing improperly

vouched for Green and his family. Akara specifically argues that Green's counsel:

> (1) Vouched for Green by asserting that Green was not intelligent enough to persuade his family to lie for him;

> (2) Vouched for Julian Green's testimony by claiming the police and prosecution knew which parts of Green's initial story were true and which were false;

> (3) Vouched for Green's and his family's allegations that Petitioner was the shooter by claiming Green was not charged with murder until months after an unrelated arrest because "the police still had their doubts that Andre Green was the shooter in this case";

> (4) Vouched for Green's testimony by misstating evidence regarding Green's identification of particular individuals in a photograph;

> (5) Vouched for Green and his family's testimony by arguing the Commonwealth, by not posing for the jury a theory on the shooter's identity, "believes that Chimezie Akara is the shooter";

> (6) Vouched for Green and his family's testimony by arguing that if they conspired to lie together in their testimony, than counsel would be complicit in that conspiracy as well;

> (7) Concluded by vouching for Green's credibility by reiterating that the Commonwealth believed Akara was the shooter.

As to the misstatement of evidence, co-defendant's comments during closing should not

have been made. However, jury instructions are generally held to be sufficient to cure

unintentional misstatements of evidence during closing arguments. *Bey*, 188 F.3d at 9. As Akara

has not claimed that the misstatements were deliberate, the trial court's instruction that closing statements are not evidence sufficiently cured any potential prejudice.

As to Petitioner's claim of improper vouching, the question of prejudice is murkier. The SJC noted that it is "improper for an attorney to vouch for a witness by expressing a personal belief in the credibility of a witness or to indicate that he or she has knowledge independent of the evidence before the jury verifying a witness's credibility." *Akara*, 465 Mass. at 265, 988 N.E.2d at 446 (internal quotation marks omitted). "Improper vouching occurs 'when [a prosecutor] places the prestige of her office behind the government's case by . . . imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted.'" *Lucien v. Spencer*, 2015 U.S. Dist. LEXIS 134154 at *62 (D. Mass. Sept. 30, 2015) (quoting *United States v. Perez-Ruiz*, 353 F.3d 1, 9 (1st Cir. 2003)). Although improper vouching traditionally occurs when the prosecutor attempts to bolster the credibility of certain witnesses or evidence, the Supreme Court has stated that "[d]efense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case." *United States v. Young*, 470 U.S. 1, 8-9, 105 S. Ct. 1038, 1042-1043 (1985) (also noting "both prosecutor and defense counsel are subject to the same general limitations in the scope of their argument"). As the SJC noted in their opinion, "[t]o permit counsel to express his personal belief in the testimony …. creates the false issue of the reliability and credibility of counsel." *Greenberg v. United States*, 280 F.2d 472, 475 (1st Cir. 1960).

Many of the comments made by Akara's co-defendant that he now complains of were likely improper, but the Court agrees with the SJC that any potential prejudice was mitigated by the jury's understanding that Green's counsel was acting only as a "zealous advocate," and that the judge's instruction preempted any remaining prejudice. Whatever vouching Green's counsel

may have done for his client or his client's family was quashed by the judge's instructions that closing arguments are not evidence, and that the jury is the sole judge of witnesses' credibility.

More concerning were Green's counsel's implications that the government in actuality believed Akara was the shooter, but chose not to present that theory of the case. This expression of personal opinion as to Akara's guilt and the suggestion the government shared that belief is particularly troubling. *See Young*, 470 U.S. at 19, 105 S. Ct. 1038 ("the prosecutor's … expressing his personal opinion concerning the guilt of the accused … can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury"). However, it cannot be said that these comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868. As noted previously, the trial judge gave limiting instructions in his jury charge both that closing arguments are not evidence and that the jury should consider the case solely on the evidence before them. There was also considerable evidence of Akara's guilt, as detailed throughout the SJC's opinion and the trial record. Finally, as noted above and in the SJC's opinion, "improper statements by counsel for a codefendant may result in prejudice to a defendant, [but] they are less likely to do so than improper arguments by a prosecutor." *See n.5 infra.* Considering these protections together, the SJC reasonably applied the federal law clearly established in *Darden* and *Donnelly*, and Akara's request for relief on this argument must be denied.

### *(iii) Co-Defendant's Counsel Inflaming the Jury's Passions With Autopsy Photos*

Finally, Akara contends that Green's counsel improperly inflamed the jury's passions by focusing on the autopsy photographs of the infant victim during his closing statement. Green's

counsel urged the jury during his closing argument that the photos were "going to rip [the jury's] heart out" and stated, "that's what Chimezie Akara did on February 5, 2003."

This was clearly error on the part of Green's counsel, but it does not afford Akara habeas relief. The Court is instructed by the facts of *Darden*: in that case, the prosecutor made a number of decidedly improper comments during his closing that attempted to appeal to the jury's emotions and passions. *Darden*, 477 U.S. at 180, 106 S.Ct. 2464. The prosecutor, among other comments, referred to that petitioner as an "animal," wishing that he could see the petitioner "with no face, blown away by a shotgun," and that "we [were] unlucky" the petitioner wasn't killed. *Id.* at 180 n.12, 106 S.Ct. 2464. Despite those comments and other similarly inflammatory remarks, the Supreme Court denied habeas relief because they did not believe the trial was "fundamentally unfair." *Id.* at 183, 106 S.Ct. 2464.

Green's counsel's focus on the autopsy photos did not rise to that level of impropriety, particularly when the trial judge had already excluded some of those photographs deemed "too prejudicial." *Akara*, 465 Mass. at 265 n.12, 988 N.E.2d at 447 n.12. As with Akara's other contentions regarding the closing statements, there are mitigating factors that make granting of habeas relief inappropriate. The evidence was strong enough to convict Akara on multiple theories. See *Young*, 470 U.S. at 19, 105 S. Ct. 1038; *United States v. Levy-Cordero*, 67 F.3d 1002. 1009 (1st Cir. 1995) (prejudice from improper comments overcome, *inter alia*, by "sufficiently strong" evidence of defendants' guilt). Moreover, as the SJC noted, the jury was properly instructed that they were not to base their decision on sympathy. The prosecutor's closing argument reiterated that message.

In sum, though some of co-defendant counsel's statements during closing arguments were improper, it cannot be said they, either individually or collectively within the context of the

closings and trial, infected the proceedings with prejudice such that Petitioner's due process rights were violated. Akara's request for habeas relief is therefore denied on this ground.

## Conclusion

For the reasons stated above, Chimezie Akara's Petition for a Writ of Habeas Corpus (Docket No. 1) is ***denied***. In addition, the Petitioner is advised that any request for the issuance of a Certificate of Appealability pursuant to 28 U.S.C. § 2253 is also ***denied***, as the Court finds that the Petitioner cannot demonstrate that reasonable jurists could debate whether his claims should be resolved in a different manner, or that there is any basis to proceed further with the issues he has presented.

**So Ordered.**

***/s/ Timothy S. Hillman***
TIMOTHY HILLMAN
DISTRICT JUDGE